ROLANDO ORTEGA-CANDELARIA,
Plaintiff

CIVIL No. 08-2382 (JAF)

v.

ERISA

JOHNSON & JOHNSON AND MEDICAL CARD
SYSTEM, INC.
Defendants

## MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

TO THE HONORABLE COURT:

COME NOW defendants OrthoBiologics LLC ("Ortho") and Medical Card System, Inc. ("MCS"), through their undersigned counsel, and very respectfully pray for judgment on the administrative record dismissing the complaint as follows:

## I. INTRODUCTION AND PROCEDURAL HISTORY

Ortho is an affiliate of Johnson and Johnson ("J&J") in Puerto Rico. Thus Ortho's employees enjoy benefits under the J&J Long Term Disability ("LTD") Plan. At all times relevant to the Complaint, the applicable LTD Plan was the J&J LTD Income Plan for Employees of J&J and Affiliated Companies in Puerto Rico of July 1, 2004. This, inasmuch as of said date, plaintiff was receiving LTD benefits.

In essence, the Plan provides for LTD benefits under a series of definitions depending on the time elapsed since the onset of the disability, as well as the nature of the same. As relevant herein, for periods of disabilities beginning on or after January 1, 2002, for disabilities stemming from accidental bodily injuries or any disorder of the body or mind, the LTD Plan limits payment

of benefits to twelve (12) months, after the elimination period.[1] To those effects, during the first twelve (12) months after the elimination period, the participant must be unable to perform the material and substantial duties of his or her regular job, with or without reasonable accommodation. After the first twelve (12) months, the participant must be unable to perform the essential functions of any job for which he or she is or could become qualified by his or her training, education and experience. Finally, a participant's failure to cooperate with the ongoing evaluation process is grounds for termination of benefits under the Plan.

In the instant case, plaintiff Rolando Ortega-Candelaria's ("Ortega" or "plaintiff") LTD benefits were terminated after he failed to cooperate with an independent functional capacity evaluation to which he was referred by MCS, the then claims administrator of the LTD Plan, as part of the ongoing evaluation process.

On December 14, 2008, plaintiff filed the case at bar against Ortho and MCS seeking judicial review of an out-of-court decision terminating payment to him of disability benefits under the LTD Plan. Ortega alleged that defendants "capriciously and arbitrarily, refused granting him his long term disability benefits," as required under the Employee Retirement Income Security Act of 1974 ("ERISA").[2] See Dkt. No. 1. Ortega demanded judgment ordering the reinstatement of the terminated benefits and payment of past benefits. Ortega also requested an award of costs and attorney's fees, and the imposition of any other penalties that may proceed under the law.

On April 6, 2009, defendants filed a *Motion to Dismiss* based on the fact that the *Complaint*

---

[1] Pursuant to the Plan, the "Elimination Period" is a period of continuous total disability due to accidental bodily injuries or any disorder of the body or mind that extends for 26 weeks.

[2] Thus, that the LTD Plan in question is regulated by ERISA is an uncontested fact.

was time-barred under the 12-month time limitation period established under the LTD Plan in question. See Dkt. No. 17. Subsequently, on June 25, 2009, the Court issued an *Opinion and Order* granting defendants' *Motion to Dismiss* on the grounds that the action was time-barred as per the provisions of the LTD Plan. See Dkt. No. 38.

Dissatisfied with the Court's decision, plaintiff filed a *Notice of Appeal before the US Court of Appeals for the First Circuit*. See Dkt. No. 43. At the end of the appellate proceedings, on October 25, 2011, the First Circuit reversed and remanded the case back to the district court for further proceedings on the merits of the claim. See Dkt. Nos. 46 and 47.

Following plaintiff's filing of an *Amended Complaint*, see Dkt. No. 51,[3] on December 22, 2011, defendants filed their *Answer to the Amended Complaint*. See Dkt. No. 52. On that same date, defendants filed a *Motion to Proceed with Matter as an Administrative Appeal and for Judgment on the Administrative Record*. See Dkt. No. 53. Following plaintiff's opposition to same, and defendants' reply to said opposition, see Dkt. Nos. 55 & 59, this Honorable Court entered an *Opinion and Order* granting defendants' request to decide matter based on the administrative record. See Dkt. No. 62.

Pursuant to said *Opinion and Order,* the appearing defendants respectfully aver, and will demonstrate below, that plaintiff's claim should be dismissed in its entirety, inasmuch as: (1) J&J, as the plan administrator, had discretionary authority to interpret the terms of the LTD Plan and to determine eligibility for benefits under the same; (2) J&J's decision to terminate plaintiff's LTD benefits was made in strict compliance with the LTD Plan; and (3) the decision was neither

---

[3]Pruning the original Complaint from all the allegations related to a breach of fiduciary duty claim, but restating the remaining allegations of his original Complaint as set forth above. See Dkt. No. 51.

arbitrary nor capricious, and was based on substantial evidence on the record. Furthermore, Ortega is not entitled to an award of attorney's fees, nor to any other remedies, as a matter of federal law.

## II. FACTS

1.    J&J maintains a LTD Plan for its employees as well as the employees of all of its affiliated companies in Puerto Rico. The administrator of the LTD Plan is the Johnson & Johnson Pension Committee. <u>See</u> LTD Plan, identified as **Exhibit 1** at 4, 28, and its Summary Plan Description, identified as **Exhibit 2** at 52.

2.    At all times relevant to the Complaint, MCS acted as the Claims Administrator for said Plan. <u>See</u> **Exhibit 2** at 52.

3.    Pursuant to the LTD Plan documents, an eligible employee is a person who is a regular full-time employee of J&J and any of its affiliated companies in Puerto Rico. <u>See</u> **Exhibit 1** at 7.

4.    To be eligible for LTD benefits, a participant must satisfy the definition of "total disability" set forth in the LTD Plan. At the times relevant to the Complaint, said definition required that, during the first twelve (12) months of disability, a participant be unable to perform the essential functions of his own occupation as a result of any sickness or injury.[4] After that initial twelve (12) months, "total disability" meant that the participant was unable to engage in any occupation for which he was qualified by education, training or experience.[5] <u>See</u> **Exhibit 1** at 6, and **Exhibit 2** at 43.

---

[4] Hereinafter referred to as "the first definition". Pursuant to the Plan, the term "sickness" means any disorder of the body or mind of a Participant, excluding Injury". **Exhibit 1** at 5. The term "Injury", on the other hand, "means only accidental bodily injury". <u>Id</u>. at 4.

[5] Hereinafter referred to as "the second definition".

5. Pursuant to the terms of the LTD Plan documents, the Claims Service Organization[6] shall have the right to examine the Participant whose injury or sickness is the basis of a claim under the LTD Plan, as well as require one or more independent medical examinations and functional capacity evaluations during the claim evaluation process, as well as while the participant is receiving benefits. Moreover, pursuant to said terms, LTD benefits can be terminated if a participant is no longer disabled pursuant to the LTD Plan's definitions. See **Exhibit 1** at 10, 14, 27.

6. The LTD Plan establishes that the J&J Pension Committee shall have the authority to reduce or terminate benefits at any time if it is determined that a participant no longer qualifies for benefits under the terms, conditions and definitions of the Plan. To that effect, failure or refusal by a participant to:

(1) supply any information required by the Plan Administrator and/or its authorized representatives in the evaluation of a claim and cooperate with any other procedures, evaluation, investigation or audit in connection with this Plan and any other benefit plan maintained by an Employer in which the participant is or was entitled to participate while receiving LTD benefits, whether performed by the Plan Administrator, the Claims Service Organization or any other delegate of the Plan Administrator,

(2) attend scheduled medical examinations or medical evaluations,

(3) cooperate with respect to the evaluation of a Participant's Total Disability or continued Total Disability,

[ . . . ]

shall constitute grounds for termination of benefits under the Plan at the sole discretion of the Plan Administrator or its authorized representative. In such event, the Participant will no longer be considered to be Totally Disabled.

**Exhibit 1** at 14-15. The LTD Plan further states that the J&J Pension Committee has the sole

---

[6]The "Claims Service Organization" means a "corporation, or other entity, retained by the Plan Administrator on behalf of the Plan to provide specified administrative services to the Plan". **Exhibit 1** at 2.

authority to:

> [ . . .]

> (10)  Exercise its discretion to determine eligibility for benefits, to construe and interpret the provisions of the Plan and to render conclusive and binding decisions and determinations based thereon;

> [ . . .]

> (16)  Exercise final authority and responsibility for administration and operation of the Plan, including without limitation adjudication of all claims and claims appeals.

**Exhibit 1** at 29-30.

7.  The LTD Plan also establishes a claim procedure, which includes both the requirements to apply for LTD benefits, as well as for filing appeals of denied or terminated claims. <u>See</u> **Exhibit 1** at 11-14.

8.  On October 25, 2002, plaintiff went on non-occupational disability leave due to physical and emotional conditions. On October 28, 2002, he also began receiving short term disability ("STD") benefits. <u>See</u> Long Term Disability Claim File, identified as **Exhibit 3** at 4. At that time, plaintiff worked at Ortho as an Electronic Technician. <u>See</u> **Exhibit 3** at 118.

9.  On June 3, 2003, plaintiff submitted his claim for LTD benefits. <u>See</u> **Exhibit 3** at 118. Plaintiff claimed that he could not bend, walk much, had constant pain in his back and legs, had anxiety, as well as panic attacks and depression. <u>See</u> **Exhibit 3** at 118.

10.  On June 10, 2003, MCS received two (2) Attending Physician Statements for physical and emotional illnesses in support of plaintiff's claim for LTD benefits. <u>See</u> **Exhibit 3** at 139-40. One of them stated that plaintiff had "panic disorder with depressive traits . . . [illegible] major depression". **Exhibit 3** at 139. The second one stated that plaintiff had "[b]ilateral L5 + .

. . [illegible] radiculopathies, lumbosacral discs herniation, degenerative scoliosis, osteoarthritis". **Exhibit 3** at 140.

11.　　On July 23, 2003, plaintiff's LTD benefits claim was approved retroactive to June 24, 2003, for his physical condition, but denied for his emotional condition. See **Exhibit 3** at 27, 57, 72. On July 28, 2003, MCS confirmed this approval to plaintiff. See **Exhibit 3** at 26. Plaintiff was also advised that he had to undergo regular treatment with a specialist for his physical condition and that his case would be evaluated periodically by MCS' Physician's Committee for his continued eligibility to LTD benefits. See id.

12.　　In order to determine his continued eligibility for LTD benefits, on October 20, 2003 plaintiff was requested to provide a copy of the medical records held by his attending physicians at the time. See **Exhibit 3** at 24. To further facilitate the foregoing, on October 16, 2003, plaintiff was requested by MCS to complete an authorization for disclosure of medical information to allow it to obtain his medical files directly from his attending physicians. See **Exhibit 3** at 67-68. Plaintiff provided MCS the completed authorization form on October 24, 2003, authorizing it to obtain his medical records from Dr. Oscar Ramos ("Doctor Ramos"). See **Exhibit 3** at 126. MCS requested doctor Ramos to provide copy of plaintiff's medical records to date, which he did. See **Exhibit 3** at 146, 151. In his progress notes received on November 4, 2003, Doctor Ramos indicates, amongst others, that plaintiff "still has severe pain at neck and back", has scoliosis, spondylosis, anxiety, depression" and that he is "permanently disabled to work". See **Exhibit 3** at 151.

13.　　On October 20, 2003, plaintiff was also requested to participate in a Functional Capacity Evaluation ("FCE"). See **Exhibit 3** at 23, 102. The FCE took place on October 30, 2003 and was conducted by Rafael E. Seín, M.D., Physiatrist ("Doctor Seín"). See **Exhibit 3** at 222-36.

According to the same, plaintiff's physical capacity level was catalogued as "sedentary", "with restrictions on prolong standing, sitting and walking as established in the overview". **Exhibit 3** at 236. Notwithstanding, in a letter dated November 20, 2003, enclosing the FCE report, doctor Seín indicated, amongst others, that:

> During the evaluation Mr. Rolando Ortega Candelaria was unable to fill the questionnaire due to pain reports and behavior with an anxiety status. He demonstrated a very restricted effort during the weighted and non-weighted activities, with a more mental involvement that aggravates his physical condition. He frequently shifted weight on either leg, even though his major pain symptoms were related to his right leg. He refused to perform some activities because of fear to be injured. His major complains were related to the upper back and right leg. He demonstrated inconsistency on the hand grip dynamometer testing. An independent psychiatrist evaluation should be perform in this case.

Id.

14.     On November 25, 2003, the progress notes provided thus far by plaintiff's attending physician, Doctor Ramos, and the results of the October 30, 2003 FCE, were forwarded to MCS's Independent Medical Consultant, José Ocasio, M.D. ("Doctor Ocasio"), for his review. See **Exhibit 3** at 132. After evaluating the same, Doctor Ocasio recommended that plaintiff's benefits be approved. See id. He also recommended that plaintiff be evaluated again in six (6) months. Id.

15.     On March 25, 2004, MCS requested plaintiff to provide copy of his updated medical records with his attending physician for his physical condition (progress notes from November, 2003 to the present). See **Exhibit 3** at 21, 125. On April 7 and 13, 2004, doctor Ramos provided the requested records. See **Exhibit 3** at 111-14, 144, 147-48.

16.     On March 25, 2004, plaintiff was also referred to a second FCE. See **Exhibit 3** at 19, 100. The FCE took place on April 6, 2004, and was conducted by doctor Seín. See **Exhibit 3** at 237-50. Its results, however, reflected an "INCONSISTENT representation of Mr. Rolando

Ortega Candelaria present physical capabilities based upon consistencies and inconsistencies when interfacing grip dynamometer graphing, resistance dynamometer measurements, pulse rate variations, weights achieved, and selectivity of pain reports and pain behaviors. Therefore, the levels identified on the Functional Overview do not represent the true safe capability level". Id at 237. Further, doctor Seín stated that:

> During the evaluation Mr. Rolando Ortega Candelaria demonstrated a very inconsistent effort to perform weighted and non-weighted activities. On the handgrip dynamometer testing demonstrated linear values, higher than the previous FCE. On the weighted activities refused to participate on some of the weighted activities which did in the previous FCE, and in the ones that participated did so with lower values than the previous FCE. In the non-weighted activities refused to participate in some that did participate in the previous FCE. The heart rate response to effort been made was poor demonstrating a limited effort. Probably this is due to a mental behavior and should be properly assess.

Id.

Doctor Seín concluded that "[u]pon analyzing the results of this evaluation Mr. Rolando Ortega Candelaria has a functional physical capacity for sedentary activities with restrictions as established in the overview". Id.

17.     On April 27, 2004, the progress notes provided thus far by plaintiff's attending physician, Doctor Ramos, and the results of the April 6, 2004 FCE, were forwarded to Dr. Ocasio for his review.  See **Exhibit 3** at 131. After evaluating the same, on April 28, 2004 Doctor Ocasio recommended the denial of plaintiff's LTD benefits for his lack of cooperation with the process. See id. However, on May 6, 2004 he reconsidered his prior recommendation and approved them. Id. He also recommended that plaintiff be evaluated again in six (6) months. Id.

18.     On August 19, 2004, plaintiff was informed that inasmuch as in Doctor Ramos' progress notes he made reference to plaintiff's emotional condition, MCS was re-evaluating its

prior denial of LTD benefits due to an emotional condition. See **Exhibit 3** at 18. To those effects, plaintiff was requested to provide copy of the progress notes of the specialist who was treating him for his emotional condition for the period of July, 2003 until the present. See id. See also **Exhibit 3** at 124. Following the receipt of said progress notes, on September 2, 2004 they were forwarded to Luis E. Cánepa, M.D. ("Doctor Cánepa") for his review. See **Exhibit 3** at 130. After evaluating the same, Doctor Cánepa indicated that plaintiff's condition seemed moderate in severity, and recommended that plaintiff be referred to an Independent Medical Evaluation ("IME") with Arlene Rivera Mass, M.D. See id.

19.     On September 13, 2004, plaintiff was requested to participate in an IME. See **Exhibit 3** at 17. The IME took place on October 13, 2004, and was conducted by Arlene Rivera Mass, M.D., a Psychiatrist ("Doctor Mass"). See **Exhibit 3** at 251-55. Doctor Mass concluded that plaintiff presented symptoms compatible with a "Panic Disorder and a Mood Disorder secondary to his secondary physical ailments of Chronic Back pain which could also be contributing to his anxiety and panic symptomatology". **Exhibit 3** at 255. However, she also concluded that:

> On the other hand the presentation on the mental status of Mr. Ortega is incompatible with his presentation. Is [sic] seems that there was a frank exaggeration of symptoms. He claimed extremely poor memory but did not present in the interview with such difficulty. This presentation in the mental status is consistent with someone with a severe Dementia which Mr. Ortega does not have. With this information it seems that the information he gave during the interview is unreliable and further investigation of it should occur is [sic] a true diagnosis is to be given. Because of this, although Mr. Ortega may present with sympomatoly [sic] that is compatible with the illness before mentioned, it is not reliable and unconformable.

Id.

20.     On October 18, 2004, the IME results were forwarded to Doctor Cánepa who, based

on Doctor Mass' conclusions, recommended the denial of LTD benefits based on plaintiff's alleged emotional condition. <u>See</u> **Exhibit 3** at 129, 48.

21.     On October 28, 2004, MCS requested plaintiff to provide copy of his updated medical records with his attending physician for his physical condition (progress notes from March, 2004 to the present). <u>See</u> **Exhibit 3** at 16, 123. On November 15, 2004, Doctor Ramos provided the requested records. <u>See</u> **Exhibit 3** at 141,-43, 145.

22.     On November 1, 2004, plaintiff was referred to a third FCE. <u>See</u> **Exhibit 3** at 15. The FCE took place on November 16, 2004, and was conducted in the Functional Capacity Evaluation Center ("FCEC").. <u>See</u> **Exhibit 3** at 256-77. The FCEC concluded that plaintiff's "symptomatic reports and behavior are out of proportion to the objective physical findings and the identified pathology". **Exhibit 3** at 259. It further concluded that plaintiff "passed only 3/21 validity criteria during the FCE, 14%, that suggests very poor effort or voluntary sub maximal effort, which is not necessary related to pain, impairment or disability". <u>Id</u>.

23.     On November 22, 2004, the progress notes provided thus far by Doctor Ramos, as well as the results of the November 16, 2004 FCE, were forwarded to Doctor Ocasio for his review. <u>See</u> **Exhibit 3** at 128. After evaluating the same, Doctor Ocasio recommended that plaintiff's LTD benefits be denied for lack of cooperation. <u>Id</u>.

24.     Based on the foregoing, on November 30, 2004, MCS notified plaintiff that his "lack of cooperation in the medical evaluation process" justified the termination of his LTD benefits, according to the LTD Plan terms. <u>See</u> **Exhibit 3** at 12-13. Hence, he was informed that the same would be terminated on November 30, 2004. <u>See id</u>. at 12. Plaintiff was also informed of his right to appeal the decision, and was asked to include in such appeal any additional medical

evidence related to his claim. See id.

25.     On December 17, 2004, and pursuant to plaintiff's request, MCS produced him copies of the FCE and IME reports conducted on March, May 22 and October 30, 2003 and April, 6, September 29 and November 16, 2004. See **Exhibit 3** at 11.

26.     On January 12, 2005, plaintiff filed an appeal of the decision to terminate his LTD benefits. See **Exhibit 3** at 278-81. Plaintiff attached to the appeal a copy of a letter signed by Doctor Ramos on December 10, 2004, stating that plaintiff "has constant pain at whole irradiated to neck, buttocks and legs". See id. at 282. It further stated that plaintiff had "several severe functional limitations in activities such as: sitting-standing, walking, bending, pushing, pulling, lifting, carrying, climbing-descending ladders nor stairs, operating foot pedals. He has seen spinal surgeons who did not recomend [sic] surgery. He has found totally and permanently disabled to work by the Social Security Administration". See id.  In  Doctor Ramos' opinion plaintiff was "totally and permanently disabled to work . . . ". See id. In support of the appeal, plaintiff also submitted  a letter signed by Dr. Marcos J. Arra ("Doctor Arra"), a Chiropractor, signed on December 20, 2004, stating that plaintiff, after receiving nine (9) chiropractic treatments . . . was "showing signs of improvement on His radiating pain and range of motion in his lumbar spine. However, the prognosis is still guarded for this patient". See id. at 284.  In support of Doctor Arra's letter, plaintiff submitted progress notes and other related medical evidence dated from approximately October 27, 2004 to December 2, 2004. See id. at 285-95.

27.     On January 19, 2005, MCS sent plaintiff a letter acknowledging receipt of his appeal and confirming that it would be sending him a response related to the denial of benefits determination within the next forty five (45) days. See **Exhibit 3** at 9.

28.     On January 19, 2005, plaintiff's record was forwarded to Doctor Ocasio for his review. See **Exhibit 3** at 127. As a result, on January 20, 2005, Doctor Ocasio recommended the denial of the appeal, inasmuch as "no new evidence" was submitted which would support a different recommendation. See id.

29.     On January 26, 2005, plaintiff was informed that the additional medical evidence provided did not justify his lack of cooperation during the November 16, 2004 medical evaluation process. See **Exhibit 3** at 7-8.  Hence, he was informed that the termination decision would be upheld. Plaintiff was also informed of his right to file a second appeal, and was asked to include in such appeal any additional medical evidence related to his claim. See id. at 7.

30.     On February 24, 2005, plaintiff requested a second appeal of his claim and attached a medical certificate signed by Doctor Ramos. See **Exhibit 3** at 296-98.     31.     On March 21, 2005, plaintiff was informed that his second appeal submitted by mail had been received on March 1, 2005. See **Exhibit 3** at 3. Plaintiff was also informed that copy of his second appeal and of his medical file was forwarded to the J&J Corporate Medical Committee for a final determination of his claim. See id.

32.     The second appeal was handled by J&J through its Disability Review Committee. See **Exhibit 3** at 1-2. On March 20, 2005, plaintiff was notified that, after evaluating his second appeal, the decision to terminate LTD benefits was upheld, inasmuch as it was determined that he had failed to cooperate with respect to the medical evaluation of his continuing total disability. Specifically, plaintiff was informed that, pursuant to the information provided by the evaluator of the November 16, 2004 FCE, plaintiff

. . . declined to lift, carry, push, pull or climb. Throughout the examination

[plaintiff] demonstrated a consistent sub-maximal effort. [Plaintiff] declined to perform the Straight Leg Raising (SLR) on [his] right leg stating [he] could not flex [his] right knee. Pictures and videos were taken in the facility showing [plaintiff] sitting in a chair with [his] right knee flexed. [Plaintiff's] symptomatic reports and behavior were out of proportion to the objective physical findings and the identified pathology. [Plaintiff] passed only 3 out of 21 validity criteria (14%) which suggested a very poor effort or voluntary sub-maximal effort which was not necessarily related to pain, impairment or disability. [Plaintiff's] Digital Tenderness Mapping (DTM) also suggested symptom exaggeration.

**Exhibit 3** at 1.

Moreover, the Disability Review Committee stated that it reviewed plaintiff's record to "determine if there were any circumstances (for example, cognitive deficit) which would explain" plaintiff's "lack of cooperation/compliance". **Exhibit 3** at 2. However, the IME conducted on October 13, 2004 showed that plaintiff was "oriented and had no evidence of organic mental problems". Id. Therefore, "in reviewing" plaintiff's "LTD file and all medical information provided in that file from" plaintiff's "treating practitioners during the time period from 10/28/02 to 3/1/05, the Committee could find no reason for" plaintiff's "exaggeration of symptoms". Id. It also concluded that plaintiff had failed to provide events or reasons for his "lack of cooperation/compliance in completing the tests that were included in the FCE". Id.

### III. DISCUSSION

A. **Plaintiff's claim should be dismissed inasmuch as the termination of his LTD benefits was not arbitrary or capricious**

   1. **J&J Pension Committee's determination to terminate plaintiff's LTD benefits must be reviewed under an arbitrary or capricious standard**

ERISA is a "comprehensive and reticulated statute." Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S. 359, 361 (1980). It governs the rights and responsibilities of parties in relation to employee pension and welfare plans. See Terry v. Bayer Corp., 145 F.3d 28, 34 (1st Cir.

1998), citing, New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 650-651 (1995). "ERISA comprehensively regulates, among other things, employee welfare benefit plans that, 'through the purchase of insurance or otherwise,' provide medical, surgical, or hospital care, or benefits in the event of sickness, accident, disability, or death." Pilot Life Insurance Co. v. Dedeaux, 481 U.S. 41, 44 (1987).

ERISA establishes a cause of action for plan participants and other beneficiaries, "to recover benefits due to him [or her] under the terms of his [or her] plan, to enforce his [or her] rights under the terms of the plan, or to clarify his [or her] right to future benefits under the terms of the plan." 29 U.S.C.A. §1132(a)(1)(B). ERISA does not establish the standard of review which courts should apply when considering benefits claims under said section. However, the United States Supreme Court has held that "a denial of benefits challenged under §1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). See also, Terry v. Bayer Corp., 45 F.3d at 34, citing Vartanian v. Monsanto Co., 131 F.3d 264, 266 (1st Cir.1997); Varity Corp. v. Howe, 516 U.S. 489, 513 (1996) ("At present, courts review [plan coverage] decisions with a degree of deference to the administrator, provided that the benefit plan gives the administrator or fiduciary discretionary authority...").

When "an ERISA plan gives the plan administrator discretionary authority to interpret the terms of the plan and to determine a claimant's eligibility for benefits," the First Circuit Court of Appeals "will uphold the decision unless it is arbitrary, capricious, or an abuse of discretion." Morales-Alejandro v. Medical Card System, Inc., 486 F.3d 693, 698 (1st Cir.2007) (citing Tsoulas v. Liberty Life Assurance

Co. of Boston, 454 F.3d 69, 76 (1ˢᵗ Cir.2006)).  See also Terry v. Bayer Corp., 145 F.3d at 37 (finding specific contract language sufficient to grant discretionary authority, requiring the court to review under "arbitrary and capricious standard"). In Terry, the First Circuit Court of Appeals noted that the contract language "specifically allocate[d] to the Company the right to find necessary facts, determine eligibility for benefits, and interpret the terms of the Plan." Terry, 145 F.3d at 37. Where a clear discretionary authority is found, "Firestone and its progeny mandate a deferential arbitrary and capricious standard of judicial review.'" Recupero v. New Eng. Tel. & Tel. Co., 118 F.3d 820, 827 (1ˢᵗ Cir.1997).  It is, of course, the hallmark of such review that "a court is not to substitute its judgment for that of the [decision-maker]." Terry, 145 F.3d at 40, citing, Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

The arbitrary and capricious standard asks only whether a fact finder's decision is plausible in light of the record as a whole.  See, e.g., Pari-Fasano v. ITT Hartford Life & Accid. Ins. Co., 230 F.3d 415, 419 (1ˢᵗ Cir.2000).  Or, put another way, whether the decision is supported by substantial evidence in the record.  See Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 183-184 (1ˢᵗ Cir. 1998).  Therefore, when an ERISA plan administrator or fiduciary has discretion to determine eligibility for benefits under a plan, his or her decision must be upheld unless arbitrary or capricious, or unless an abuse of discretion is found. See  Donato v. Metropolitan Life Ins. Co., 19 F.3d 375, 380 (7ᵗʰ Cir. 1994), citing,  Fuller v. CBT Corp., 905 F.2d 1055, 1058 (7ᵗʰ Cir.1990).

In the case at bar, the LTD Plan grants discretionary authority to the plan administrator and its delegate, the claims administrator, which as relevant to the case at bar was MCS, to make the necessary decisions concerning eligibility for benefits.  See Terry, 145 F.3d at 40, citing, DeWitt v. Penn-Del Directory Corp., 106 F.3d 514, 520 (3ʳᵈ  Cir.1997) (In the ERISA context, it has been held that under

the arbitrary and capricious standard, "a fiduciary's interpretation of a plan will not be disturbed if reasonable.") To those effects, the LTD Plan specifically provides that the named fiduciary for the administration of the LTD benefits claims "may exercise discretion in the operation in making determination of fact, interpreting the terms of the Plan, adopting rules and taking other actions with respect to which it has authority. Any interpretation or determination made pursuant to such discretionary authority shall be conclusive and given full force and effect, subject to any right to appeal the interpretation or determination as set forth in Article IV." The Plan further states that J&J Pension Committee has the sole authority to, among others, "[e]xercise its discretion to determine eligibility for benefits, to construe and interpret the provisions of the Plan and to render conclusive and binding decisions and determinations based thereon;" and "[e]xercise final authority and responsibility for administration and operation of the Plan, including without limitation adjudication of all claims and claims appeals."See Section II above, at ¶ 6.

In light of the above, it is clear that in reviewing plaintiff's claim this Honorable Court should uphold the claims administrator's decision to terminate LTD benefits, unless the same are found to be arbitrary, capricious, or not based on evidence in the record, "which is to say 'downright unreasonable.'" See Donato, 19 F.3d at 380.

**2.     Contours of the arbitrary and capricious standard of review**

The operative inquiry under the "arbitrary and capricious" or "abuse of discretion"standard of review is "whether the aggregate evidence, . . ., could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." See Wright v. R.R. Donnelley & Sons, 402 F.3d 67 (1st Cir. 2005), citing Twomey v. Delta Airlines Pension Plan, 328 F.3d 27, 31 (1st Cir.2003), citing Leahy v. Raytheon, 315 F.3d 11, 18 (1st Cir.2002). In fact, "the factual

determination of eligibility for benefits is decided solely on the administrative record, and '*the non-moving party is not entitled to the usual inferences in its favor*.'". <u>Bard v. Boston Shipping Ass'n</u>, 471 F.3d 229, 235 (1st Cir. 2006), <u>citing</u> <u>Orndorf v. Paul Revere Life Ins. Co.</u>, 404 F.3d 510, 517 (1st Cir.2005). (Emphasis ours). Therefore, under the arbitrary and capricious standard of review, the question is not which side is right, "but whether the insurer had substantial evidentiary grounds for a reasonable decision in its favor." <u>Matías-Correa v. Pfizer, Inc.</u>, 345 F.3d 7, 12 (1st Cir. 2003), <u>citing</u>, <u>Brigham v. Sun Life of Canada</u>, 317 F.3d 72, 85 (1st Cir. 2003). <u>See also</u> <u>Otero Carrasquillo v. Pharmacia Corp.</u>, 466 F.3d 13, 17-18 (1st Cir. 2006), <u>citing</u> <u>Liston v. Unum Corp. Officer Severance Plan</u>, 330 F.3d 19, 24 (1st Cir.2003) ("the question here is whether the district court correctly concluded that [defendants'] interpretation of the Plan's language, and its ultimate benefits determination based upon that interpretation, were reasonable."); <u>Brown v. Retirement Committee of Briggs & Straton</u>, 797 F.2d 521, 529 (7th Cir. 1986) ("[w]hen such a power [to interpret the terms of the plan and to determine eligibility for benefits] has been conferred, the judicial role is limited to determining whether the . . . [defendant's] interpretation was made rationally and in good faith- *not whether it was right*") (Emphasis ours); <u>Snow v. Standard Ins. Co.</u>, 87 F.3d 327, 332 (9th Cir. 1996) (the abuse of discretion standard "does not permit the overturning of a decision where there is substantial evidence to support the decision, that is, where there is 'relevant evidence [that] reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence'"), <u>overturned on other grounds</u>, <u>Kearney v. Standard Ins. Co.</u>, 175 F.3d 1084, 1089-1090 (9th Cir. 1999). In sum, a decision to deny benefits to a beneficiary will be upheld if the administrator's decision was reasoned and supported by substantial evidence. <u>See Tsoulas v. Liberty Life Assur. Co. of Boston</u>, 454 F.3d 69 (1st Cir. 2006); <u>Gannon v. Metro. Life Ins.</u>

Co., 360 F.3d 211, 213 (1st Cir.2004); See also Boardman v. Prudential Ins. Co. of Am., 337 F.3d 9, 15 (1st Cir.2003) (holding that a district court can "overturn [an administrator's] termination decision only if 'the insurer's eligibility determination was unreasonable in light of the information available to it'.").

Evidence is considered to be substantial when it is "reasonably sufficient to support a conclusion." Boardman, 337 F.3d at 15. Evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision. See Gannon, 360 F.3d at 213; Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 30 (1st Cir.2001) ("[T]he existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary."); Doyle, 144 F.3d at 184 ("Sufficiency, of course, does not disappear merely by reason of contradictory evidence."). In addition, and especially before the arbitrary and capricious standard of review, the fact that the fiduciary did not consider evidence that was not before it does not constitute grounds for reversal. "[A]n administrator's decision is not arbitrary or capricious for failing to take into account evidence not before it". See Sandoval v. Aetna Life and Cas. Ins. Co., 967 F.2d 377, 381 (10th Cir. 1992).

### 3. Plaintiff failed to show that the decision by J&J Pension Committee to deny his claim for LTD benefits was arbitrary or capricious or an abuse of discretion

"The burden to show that the decision was arbitrary, capricious or an abuse of discretion is on the claimant." Metropolitan Life Ins. Co. V. Colón Rivera, 204 F. Supp. 2d 273, 278 (D.P.R. 2002). A claimant challenging an out-of-court decision denying benefits under an ERISA regulated plan has the burden to establish that the decision was "improperly motivated". Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 185 (1st Cir. 1998). Plaintiff has failed to meet his burden in this case.

The LTD Plan conditioned continued eligibility for disability benefits on compliance with recommended treatment and cooperation during evaluations requested pursuant to the Plan. See Section II above, at ¶ 6. Within the authority conferred to MCS as Claims Administrator, it was not unreasonable for MCS to order plaintiff to undergo periodic Functional Capacity Evaluations nor it was unreasonable for the Plan to establish that failure to cooperate with the evaluation process was grounds for termination of benefits. Plaintiff does not appear to contest defendants' authority to do so. Instead, plaintiff seems to suggest that defendants disregarded medical evidence submitted by his treating physician Dr. Ramos. To that effect, in his first administrative appeal, plaintiff claimed that he could not perform all the activities requested from him during the 3rd FCE because Dr. Ramos had specifically "prohibited" him to perform such activities in order to avoid aggravating his condition and that he had been found totally and permanently disabled by the Social Security Administration. See Section II above, at ¶ 26 and Exhibit 3 at 278-81. Plaintiff attempts to convince the Court to overturn defendants' decision to deny his claim for LTD benefits contending that J&J and MCS were obliged to accord special deference to the opinions of Dr. Ramos, his attending physician. Plaintiff's proposition is flawed.

Reliance on the treating physician rule is misplaced and flies in the face of First Circuit's clear precedent. See Richards v. Hewlett-Packard Corp., 592 F.3d 232, 240 (1st Cir.2010)(citing Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 526 (1st Cir.2005))(citing Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003)); Buffonge v. Prudential Insurance Co. of America, 426 F.3d 20, 27 (1st Cir.2005) Leahy v. Raytheon Co., 315 F.3d 11 (1st Cir. 2002). In Leahy, the plaintiff alleged "that the plan administrator gave insufficient weight to the views of his treating physicians." 315 F.3d at 20. The First Circuit, while noting that it had not yet taken a definitive position as to the

applicability *vel non* of the treating physician rule in ERISA cases, and that it saw no need to do it in said case, stated:

> The treating physician rule originated in the social security setting and has been formalized by regulation in that context. The rule requires that the factfinder (there, the administrative law judge) weigh more heavily the opinions of the claimant's treating physicians in determining his or her eligibility for benefits. The rationale for the rule is said to be that treating physicians have the best opportunity "to know and observe the patient as an individual."

> The calculus of decision in social security cases differs significantly from that employed in ERISA cases. In the former instance, Congress and the Secretary of Health and Human Services have established a specific framework for determining disability. This framework entails specially promulgated standards, a shifted burden of persuasion, restricted discretion, and agency involvement. The treating physician rule addresses this peculiar combination of factors and forces the agency to pay particular heed to the medical professionals who are in charge of a particular claimant's case. No comparable combination of factors exists in ERISA cases: there is no specially promulgated set of criteria, no shifted burden of persuasion, no restricted discretion, and no agency involvement. The fiduciary's decision is constrained only by the language of the particular plan at issue and by a judge-made adjudicative standard.

Id. (Internal citations omitted).

Less than a year after Leahy, the United States Supreme Court held that "courts have no warrant to require administrators [in ERISA benefits plans] automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators the discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." The Black & Decker Disability Plan v. Nord, 583 U.S. st 823-824. The Supreme Court determined that "ERISA does not require plan administrators to accord special deference to the opinions of treating physicians." 583 U.S. at 822-23. Accordingly, the Court chose to grant employers greater leeway to design disability and welfare plans as they see fit. In other words, and according to the Supreme Court, the "treating physician rule" does not apply to ERISA cases. See also Orndorf,

404 F. 3d at 526; <u>Matias-Correa v. Pfizer, Inc.</u>, 345 F.3d 7, 12 (1st Cir.2003).

Consequently, the issue is not whether plaintiffs' treating physician's view of his conditions was different from the claims administrator's, but whether there was evidence in the record to support its determination. <u>See</u> <u>Wright v. R.R. Donnelley</u>, 402 F.3d at 78 (holding that although after applying the arbitrary and capricious standard of review some contradictory evidence was found, substantial evidence existed to support defendant's denial of plaintiff's claims.).[7] Otherwise, claims administrators would be deprived from their role to determine whether an employee is disabled or not under the terms of their Plans. <u>See</u> <u>García v. Raytheon Employees Disability Trust</u>, 122 F. Supp.2d 240, 245 (D. N.H. 2000), <u>citing</u>, <u>Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.</u>, 32 F.3d 120, 126 (4th Cir.1994). It is not unreasonable for a benefit plan administrator, for example, to rely on the opinion of a non-examining physician in reaching an eligibility determination, even where the non-examining physician's opinion contradicts that of the examining physician." <u>García</u>, 122 F. Supp. 2d at 246.

As a corollary, the First Circuit has held that plan and claims administrators do not act arbitrarily or capriciously when they consider the opinions of independent medical evaluators, even in instances in which the evaluators performed only a file evaluation, and did not physically examine the plan participant. <u>See, e.g.</u> <u>Tsoulas v. Liberty Life Assur. Co. of Boston</u>, 454 F.3d 69, 81-82 (1st Cir. 2006); <u>Gannon</u>, 360 F.3d at 214; <u>Orndorf</u>, 404 F. 3d at 526.

Furthermore, the First Circuit has repeatedly held that the fact that a participant has been found to be disabled by the Social Security Administration is in no way determinative of his or her

---

[7] <u>See also, Delta Family-Care Disability and Survivorship Plan v. Marshall</u>, 258 F.3d 834, 843 (8th Cir. 2001) ("Where the record reflects conflicting medical opinions, the plan administrator does not abuse its discretion in finding the employee not to be disabled.")

entitlement to benefits under an ERISA-covered plan, nor binding upon the plan administrator's decision. See Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d at 419-20; Gannon, 360 F.3d at 215-216; Smith v. Fortis Benefits Ins. Co., 77 Fed.Appx. 532, 533 (1st Cir. 2003) (unpublished disposition); Matías, 345 F.3d at 12; Boardman v. Prudential Ins. Co. of America, 337 F.3d 9, fn. 4 (1st Cir. 2003), citing Cook v. Liberty Life Assurance Co., 320 F.3d 11, 16 n. 5 (1st Cir.2003).

Moreover, plaintiff's claim ignores the fact that the noted lack of cooperation during his third FCE was not the first time that he had failed to cooperate during such an evaluation. As was previously discussed, during the first FCE held on October 2003, Dr. Seín noted that plaintiff "demonstrated a very restricted effort during the weighted and non-weighted activities" and "refused to perform some activities because of fear to be injured." See Section II above, at ¶ 13. On his second FCE held on March 2004, Dr. Seín once again noted that plaintiff "demonstrated inconsistent effort to perform weighted and non-weighted activities" and "refused to participate on some of the weighted activities which [he had done] in the previous FCE." See Section II above, at ¶ 16. After this second demonstration of lack of cooperation, MCS's Independent Medical Consultant, Dr. Ocasio, recommended the termination of plaintiff's LTD benefits. Dr. Ocasio later reconsidered his position and plaintiff continued to receive benefits. See Section II above, at ¶ 17. Inasmuch as plaintiff's treating physician Dr. Ramos had referred to plaintiff's emotional condition in his progress notes, MCS motu proprio decided to re-evaluate its prior denial of benefits for plaintiff's emotional condition. See Section II above, at ¶¶ 16-17. Said evaluation conducted by Dr. Rivera Mass on September 2004 concluded, however, that plaintiff's mental status was "incompatible with his presentation" and that in her opinion there was a "frank exaggeration of symptoms." See Section II above, at ¶ 19. A few months later, on November 2004, plaintiff participated on his third FCE, which

concluded that plaintiff's poor showing suggested "very poor effort or voluntary sub-minimal effort, which is not necessarily related to pain, impairment or disability." See Section II above, at ¶ 13. Plaintiff may have claimed that, for example, he could not flex his right knee during the FCE, but as the FCEC Report establishes (and its accompanying picture shows) video from the FCEC showed he was able to sit and flex his right leg. See Exhibit 3 at 257. Thus, throughout the entire evaluation process plaintiff had shown a sub-par cooperation with the FCE tests.

J&J and MCS made a fact-based determination upon the evidence before them. A court cannot substitute its own weighing of the conflicting evidence for that of the plan or claims administrator's. Even if plaintiffs' attending physician may have opined or concluded that plaintiff was unable to complete the third FCE because doing so may have aggravated his condition, "that fact would not preclude the Plan Administrator [or plan fiduciary] from denying benefits." Elliott v. Sara Lee Corp., 190 F.3d 601, 606 (4th Cir. 1999). It is not an abuse of discretion for a plan administrator to deny disability pension benefits where conflicting medical reports were presented. See Ellis v. Metropolitan Life Insurance Co., 126 F.3d 228, 234 (4th Cir.1997) (finding no abuse of discretion in fiduciary's denial of benefits where claimant's primary medical provider's finding of disability conflicted with reports of independent panel of medical consultants); Brogan v. Holland, 105 F.3d 158, 162-63 (4th Cir. 1997) (affirming district court's grant of summary judgment for trustees where medical evidence was conflicting as to whether plaintiff's stroke occurred during course of employment).

The fact that defendants granted greater weight to the report issued by the FCEC than to Dr. Ramos' does not make J&J Pension Committee's determination to terminate plaintiff's LTD benefits arbitrary or capricious. See Matias-Correa v. Pfizer, Inc., 345 F.3d at 12 (noting that it is not the

court's role to evaluate how much weight an insurer should have accorded the opinion of an independent medical consultant relative to the opinions of a claimant's own physicians); see also Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 30 (1st Cir.2001) ("[T]he existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary.").

The analysis in a determination of a denial of benefits in an ERISA case begins with an examination of the governing plan documents. See Metropolitan Life Ins. Co. v. Parker, 436 F.3d 1109, 1113 (9th Cir. 2006). An ERISA plan must be administered in the interest of the participants and beneficiaries in accordance with the documents and instruments governing the plan. See 29 U.S.C. § 1104(a)(1)(D). Here, the Plan documents unambiguously required participants to cooperate "with respect to the evaluation of [his/her] Total Disability or continued Total Disability." It is clear from the record that plaintiff did not cooperate with his third FCE, making MCS and J&J unable to reach a determination that plaintiff was disabled. It is therefore irrelevant whether plaintiff was in fact disabled because his breach of the Plan's terms prevented such a determination from being made.

In light of the above, it is clear that defendants did not act arbitrarily or capriciously in upholding the termination of plaintiff's LTD benefits because of his lack of cooperation. Thus, defendants' decision should be upheld, and plaintiff's claim should be dismissed.

In San Juan, Puerto Rico, this 3rd day of July, 2012.

WE HEREBY CERTIFY that on this same date , we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system: Pedro J. Landrau-López, P.O. Box 29407, San Juan, Puerto Rico 00929-0407. Parties may access this filing through the Court's system.

**SCHUSTER AGUILÓ LLP**
Attorneys for Defendant
PO Box 363128
San Juan, Puerto Rico 00936-3128
Telephone: (787) 765-4646
Telefax: (787) 765-4611

**s/Lourdes C. Hernández Venegas**
**Lourdes C. Hernández Venegas**
USDC PR No. 215507
lhernandez@salawpr.com

**s/Shiara L. Diloné-Fernández**
**Shiara L. Diloné-Fernández**
USDC PR No. 222104
sdilone@salawpr.com

**s/Elizabeth Pérez-Lleras**
**Elizabeth Pérez-Lleras**
USDC PR No. 221908
eperez@salawpr.com

H:\ATTY\SLD\ORTHO\ORTEGA\Pleadings\Mot Judg Adm Record.wpd